UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| ASHLEY SLAGLE[1] on behalf of L.N.[2], | CASE NO. 3:11CV2304 |
| Plaintiff, | MAGISTRATE JUDGE GEORGE J. LIMBERT |
| v. | |
| MICHAEL J. ASTRUE, COMMISSIONER OF OF SOCIAL SECURITY, | **MEMORANDUM OPINION AND ORDER** |
| Defendant. | |

Ashley Slagle ("Plaintiff"), acting on behalf of L.N., a minor ("Claimant"), seeks judicial review of the final decision of Michael J. Astrue ("Defendant"), Commissioner of the Social Security Administration ("SSA"), denying Claimant's Supplemental Security Income ("SSI") claim. ECF Dkt. #1.  For the following reasons, the Court AFFIRMS the ALJ's decision and DISMISSES Plaintiff's complaint in its entirety with prejudice:

**I**. **PROCEDURAL HISTORY**

On January 27, 2009, Plaintiff, acting on behalf of Claimant, filed an application for child's SSI, alleging disability as of February 1, 2008. ECF Dkt. #12 at 122-127.  The application was denied initially and on reconsideration. *Id.* at 54-55.  On September 10, 2009, Plaintiff filed a request for a hearing by an ALJ.  *Id.* at 70-72.

On February 1, 2011, an ALJ conducted an administrative hearing, where Plaintiff and Claimant appeared and were represented by counsel. *Id.* at 27-53.  At the hearing, the ALJ accepted testimony from Plaintiff.  *Id*.  On February 17, 2011, the ALJ issued a Notice of Decision -

---

[1]In Plaintiff's brief, she indicated that her last name is "Slagle."

[2]*See* L.R. 8.1(a)(2).

Case: 3:11-cv-02304-GJL  Doc #: 19  Filed: 07/30/12  2 of 11.  PageID #: 649

Unfavorable. *Id.* at 5-26. On September 20, 2011, the Appeals Council denied Plaintiff's request for review. *Id*. at 1-3.

On October 27, 2011, Plaintiff filed the instant suit seeking review of the ALJ's decision. ECF Dkt. #1. On May 28, 2012, Plaintiff filed a brief on the merits. ECF Dkt. #17. On July 11, 2012, Defendant filed a brief on the merits. ECF Dkt. #18. No reply brief was filed.

**II**.   **STEPS TO DETERMINE WHETHER CHILD IS ENTITLED TO SSI**

In order to qualify for childhood SSI benefits, a claimant must show that he or she has a medically determinable physical or mental impairment which results in marked and severe functional limitations, and that is expected to cause death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 20 C.F.R. § 416.906. An ALJ must proceed through the required sequential steps for evaluating entitlement to childhood SSI. 20 C.F.R. § 416.924(a). The three-step procedure requires the ALJ to determine whether a child:

> (1) is performing substantial gainful activity;
>
> (2) has a "severe" impairment or combination of impairments; and
>
> (3) whether the impairment or combination of impairments are of listing-level severity in that the impairment(s) either meets, medically equals or are the functional equivalent in severity to an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1 ("Listing");

20 C.F.R. § 416.924(a)-(d). In order to *meet* a Listing, the child's impairment(s) must be substantiated by medical findings shown or described in the listing for that particular impairment. 20 C.F.R. § 416.925(d)(emphasis added). In order to *medically equal* a Listing, a child's impairment(s) must be substantiated by medical findings at least equal in severity and duration to those shown or described in the listing for that particular impairment. 20 C.F.R. § 416.926(a) (emphasis added). In order to *functionally equal* a Listing, the child's impairment(s) must be of listing-level severity; *i.e.*, it must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(a)(emphasis added). The Commissioner assesses all relevant factors, including:

> (1) how well the child initiates and sustains activities, how much extra help he needs, and the effects of structured or supportive settings;
>
> (2) how the child functions in school; and

-2-

(3) how the child is affected by his medications or other treatment.

20 C.F.R. § 416.926a(a)(1)- (3). Further, in considering whether a child's impairment functionally equals the Listings, the Commissioner begins by evaluating how a child functions on a daily basis and in all settings as compared to other children of the same age who do not have impairments. 20 C.F.R. § 416.926a(b).

The Commissioner considers how a child's functioning is affected during his activities at home, school and in his community in terms of six domains:

>  (i) acquiring and using information;
> 
>  (ii) attending and completing tasks;
> 
>  (iii) interacting and relating with others;
> 
>  (iv) moving about and manipulating objects;
> 
>  (v) caring for yourself; and,
> 
>  (vi) health and physical well-being.

20 C.F.R. § 416.926a(b)(1)(i)-(vi).

Lengthy definitions for "marked" and "extreme" are set out in § 416.926a(e). "Marked" limitation means a limitation that is "more than moderate" but "less than extreme." It is the equivalent of the functioning expected on standardized testing with scores that are at least two, but less than three, standard deviations below the mean. See § 416.926a(e)(2)(i). "Extreme" limitation is the rating for the worst limitations. However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function. It is the equivalent of the functioning that would be expected on standardized testing with scores that are at least three standard deviations below the mean. See 20 C.F.R § 416.926a(e) (3)(I).

An individual has a "marked" limitation when the impairment "interferes seriously with [the] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). An "extreme" limitation exists when the impairment "interferes very seriously with [the] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). An extreme limitation may also seriously limit day-to-day functioning. *Id.*

If the child's impairment meets, medically equals, or functionally equals the Listing, and if the impairment satisfies the Act's duration requirement, then the child is considered disabled. 20 C.F.R. § 416.924(d)(1). If both of these requirements are not satisfied, then the child is not considered disabled. 20 C.F.R. § 416.924(d)(2).

### III.  STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990). The Court cannot reverse the decision of an ALJ, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion. *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 528 (6th Cir.1997). Substantial evidence is more than a scintilla of evidence, but less than a preponderance. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is evidence that a reasonable mind would accept as adequate to support the challenged conclusion. *Id.*; *Walters,* 127 F.3d at 532. Substantiality is based upon the record taken as a whole. *Houston v. Sec'y of Health and Human Servs.*, 736 F.2d 365 (6th Cir. 1984).

### IV.  RELEVANT PORTIONS OF THE ALJ'S DECISION

The ALJ found that Claimant was an older infant, was not engaged in substantial gainful activity, and that he had the severe impairment of mild left hemiparesis/cerebral palsy and asthma. *Id.* at 11. She further found that Claimant's severe impairments, individually or in combination with other impairments, did not meet or medically equal any of those in the Listings. *Id*. The ALJ specifically considered Listings 103.02 (Chronic pulmonary insufficiency), 103.03 (Asthma) and 111.07 (Cerebral palsy). The ALJ then determined that Claimant's impairments, individually or in combination, did not functionally equal the Listings. *Id*. at 12. Although the ALJ found that Claimant has a marked limitation in moving about and manipulating objects, she concluded that

-4-

Claimant had less than marked restrictions in the remaining domains. Based upon her findings, the ALJ concluded that Claimant was not disabled and therefore not entitled to childhood SSI. *Id.* at 21.

## V. ANALYSIS

Plaintiff claims that the ALJ erred in concluding that Claimant's ability to attend and complete tasks is less than markedly impaired. Plaintiff further asserts that the ALJ failed to give appropriate weight to the opinion of Claimant's treating physician. Because Plaintiff challenges the ALJ's determination regarding Claimant's ability to attend and complete tasks, the Court will focus on the evidence in the record specifically relating to that domain.

Claimant was born on July 7, 2007 at thirty-two weeks due to premature labor. *Id.* at 338. In November of 2007, Amelia S. Prack, M.D., Claimant's treating physician, noticed decreased spontaneous movement in his right lower extremity and cranial asymmetry, and referred him to New Beginnings Pediatrics. *Id.* at 355-359. Paul Wnek, M.D. evaluated Claimant on November 30, 2007 and diagnosed mildly decreased muscle tone on the right side and reduced grip of the right hand. *Id.* at 458. Dr. Wnek referred Claimant for a neurological evaluation with G. Dean Timmons, M.D. and for physical therapy. *Id.*

Claimant was evaluated in the physical therapy department of Fisher-Titus Medical Center on December 18, 2007 for possible torticollis[3] and cerebral palsy. *Id. at* 282-284. The physical therapist noted that, although Claimant was referred with a diagnosis of right-sided weakness, he demonstrated greater weakness on his left side. *Id. at* 283. Claimant began physical therapy to address his inability to roll from supine to prone and back, and to sit unsupported or with use of upper extremities for propping. *Id. at* 284-290.

Dr. Timmons saw Claimant on January 3, 2008 for a neurological evaluation. *Id.* at 364. Claimant could not roll over and had slightly increased muscle tone on the right side with increased muscle stretch reflexes with the right leg. *Id.* at 364. The doctor's impressions were plagiocephaly[4]

---

[3]Torticollis, or wryneck, is a stiff neck associated with muscle spasm.

[4]Plagiocephany is a condition characterized by an asymmetrical distortion (flattening of one side) of the skull.

and right hemiparesis.[5]  *Id.*  A CT scan taken January 14, 2008 suggested unilateral plagiocephaly with posterior fontanelle appropriate for Claimant's age.  *Id.* at 367.  In July 2008, Claimant was "army crawling," had increased muscle power and tone on the right, and had decreased fine and gross motor coordination on the right.  *Id.* at 261. The diagnoses remained plagiocephaly and right hemiparesis.  *Id.* at 261.

Dr. Prack continued to see Claimant for regularly scheduled office visits.  In October 2008, Claimant developed rapid respirations, which were relieved by use of an aerosol treatment.  *Id.* at 387.  The doctor believed Claimant had suffered an asthma attack.  *Id.* at 387.  Claimant was seen in the emergency department of Mercy Hospital on November 9 and 17, 2008 for complaints of congestion and fever.  *Id.* at  291-296, 297-303. He was treated with an antibiotic and Prednisone. *Id.* at 298.

Dr. Wnek continued to see Claimant through July 2009 for congenital torticollis and infantile hemiplegia/muscle weakness.  *Id.* at 429-460.  Dr. Wnek treated Claimant for acute bronchitis and upper respiratory infections on several occasions.  *Id.* at 445-446, 447-448, 449-450, 451-452, 453-454, 457-458. With respect Claimant's hemiplegia, Dr. Wnek found hyptonia[6] on the right side. *Id.* at 431, 456.  Developmentally, at age 19 months, Claimant could drink from a cup, scribble, sit in a chair, and throw and kick a ball, but he could not climb stairs without assistance, use a spoon, stack three to four blocks, turn pages in a book or take off his shoes.  *Id.* at 432. He was referred to a rehabilitation specialist and for occupational and physical therapy due to developmental delays. *Id.* at 432-433, 439.

At Dr. Wnek's request, Claimant was evaluated by pediatric rehabilitation specialist Julie Miller, D.O. in February 2009.  *Id.* at 533-534.  Dr. Miller found Claimant to be "very busy" throughout the examination noting that he was moving about during the examination and did not particularly like being examined. *Id.* at 534.  Dr. Miller's impression was mild left hemiparesis with

---

[5]Hemiparesis is weakness on one side of the body.

[6]Hyptonia is a state of low muscle tone (the amount of tension or resistance to the movement in a muscle.

-6-

suspected cerebral palsy although she believed a formal diagnosis of cerebral palsy was premature. *Id.* at 534.

Claimant was evaluated in the physical therapy department of Mercy Hospital on February 20, 2009. *Id.* at 412-414. The physical therapist noted that Plaintiff was concerned about Claimant's clumsiness, ignoring his left side, and his severe temper tantrums. *Id.* at 414. Peabody Developmental Motor Scale testing revealed below average results in object manipulation . *Id.* at 413. The therapist recommended weekly therapy sessions to facilitate his gross motor skills. *Id.* at 412.  Claimant attended eight sessions and, at discharge, continued to have decreased coordination and decreased body awareness tripping easily due to inattention and decreased proprioception. *Id.* at 321-326, 416-422.

On July 8, 2009, Dr. Prack recommended that Claimant go to occupational therapy because he had difficulty holding a spoon, coloring, and walking up stairs. *Id.* at  471. On August 25, 2009, Monica Powers, L.P.T., of Fisher Titus, found that Claimant had made wonderful gains in gross motor skills.  He was very active with climbing, jumping, and hopping. He also showed good strength on both sides, demonstrated good coordination, and was developing nicely.

Her only concern was Claimant's need for constant verbal cues to complete an obstacle course due to wandering behaviors.  She also notes that he throws tantrums. *Id.* at 516-17. Powers recommended a consultation with Occupational Therapy for input on working through his behavioral problems.  *Id.*  Claimant began occupational therapy at Fisher-Titus. According to a quarterly update/discharge summary dated September 24, 2010,  Claimant had high energy and required cues to complete a three-step motor sequence.  Although he was more compliant with seated tasks, his attention was brief.  *Id.*  at  550.

On March 19, 2009, Claimant was referred by the Bureau of Disability Determination to J. Joseph Konieczny, Ph.D. Dr. Konieczny opined that Claimant's capabilities in the areas of concentration and persistent were adequate for an individual his age. *Id.* at 308. Dr. Konieczny notes that Claimant was typically responsive to his mother's direction when he was not aware that he was being observed. *Id.* at 307.

At the hearing, Plaintiff testified that Claimant throws tantrums when he is unable to verbalize what he wants. *Id.* at 36. However, she conceded that he was starting speech therapy and that his speech is improving. *Id.* at 40. She further testified that Claimant is good at puzzles, although he has difficulty manually inserting the puzzle pieces. *Id.* at 38, 40. Plaintiff testified that Claimant likes to sit and play with his "Hot Wheels" and that he often acts out the process of going to a gas station. *Id.* at 39. When Plaintiff cleans the house, Claimant often attempts to assist her. *Id.* at 41. She testified that he is observant of other children, that he will "sit back and pay attention," rather than joining in to play with them. *Id.* at 42. Later in her testimony, she stated that Plaintiff can only sit for ten minutes "and then he's running around the house." *Id.* Plaintiff claimed that Claimant only pays attention "sometimes" and that she had chosen not to send him to pre-school for this reason. *Id.*

The appropriate functioning of an older infant or toddler (age 1 to attainment of age 3) in the domain of attending and completing tasks is described as follows:

> At this age, you should be able to attend to things that interest you and have adequate attention to complete some tasks by yourself. As a toddler, you should demonstrate sustained attention, such as when looking at picture books, listening to stories, or building with blocks, and when helping to put on your clothes.

20 C.F.R. § 416.926a(h)(2)(i). The ALJ provided the following analysis of Claimant's ability to attend and complete tasks:

> The objective medical evidence, the medical opinions, and allegations regarding the claimant's condition were all considered in making this determination. However, the medical record does not support any more than a finding of less than marked limitations in the claimant's ability [to] attend and complete tasks. While the claimant's mother alleged that the claimant has problems focusing and paying attention, the medical record does not indicate that he is taking medication or receiving treatment for this problem. Furthermore, the claimants activities such as playing independently with toy cars and trying to help his mother clean the house are consistent with less than marked limitations in attending and completing tasks.

ECF Dkt. #12 at 17.

The ALJ correctly observed that, although Claimant is prone to distractions and tantrums, he is not currently being prescribed medication for his behavioral problems. Plaintiff argues that Claimant did receive treatment for his behavioral problems, in the form of occupational therapy. Here, the lack of prescription medication indicates that Claimant's physicians and therapists do not

-8-

consider the problem to be so severe as to require medication. Moreover, Plaintiff testified that Claimant plays with his "Hot Wheels," completes puzzles, and attempts to help her clean the house, which are activities that require the level of sustained attention described in the regulations. Accordingly, there is sufficient evidence in the record to support the ALJ's decision with respect to Claimant's ability to attend and complete tasks.

Next, Plaintiff contends that the ALJ erred in not giving controlling weight to the opinion of Dr. Prack. The ALJ did not give controlling weight to the Medical and Functional Equivalence Evaluation completed by Dr. Prack on December 20, 2010, in which Dr. Prack concluded that Claimant was markedly limited in his ability to acquire and use information, attend and complete tasks, interact and relate to others, to care for himself, and in his health and physical well-being. Dr. Prack further opined that Claimant had only moderate limitations in his ability to move and manipulate objects. ECF Dkt. #12 at 529-530.

The ALJ must generally give greater deference to the opinions of the claimant's treating physicians than to those of non-treating physicians. SSR 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson*, 378 F.3d at 544. A presumption exists that the opinion of a treating physician is entitled to great deference. *Id.*; *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007). Accordingly, if that presumption is not rebutted, the ALJ must afford controlling weight to the opinion of the treating physician if that opinion regarding the nature and severity of a claimant's conditions is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." *Wilson,* 378 F.3d at 544.

However, "[t]he determination of disability is [ultimately] the prerogative of the [Commissioner], not the treating physician." *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) quoting *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir.1985). When an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must consider the following factors in determining the weight to give to that opinion: the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors. *Id.*

If an ALJ decides to discount or reject a treating physician's opinion, he must provide "good reasons" for doing so. SSR 96-2p. The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* This allows a claimant to understand how his case is determined, especially when he knows that his treating physician has deemed him disabled and he may therefore " 'be bewildered when told by an administrative bureaucracy that he is not, unless some reason for the agency's decision is supplied.' " *Wilson,* 378 F.3d at 544 quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999).

Further, it "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.* If an ALJ fails to explain why he rejected or discounted the opinions and how those reasons affected the weight accorded the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers,* 486 F.3d at 243, citing *Wilson*, 378 F.3d at 544.

The ALJ provided the following explanation for his decision to give little weight to the opinion of Dr. Prack:

> First, the questionnaire provided only indentified [sic] broad limitations and failed to give specific examples of how the claimant was limited in any of the functional domains. Furthermore, the assessment submitted did not provide an option for no limitations or less than marked limitations in the six functional domains; this suggests that Dr. [Prack] may be unfamiliar with the definitions of marked and less than marked, and how they pertain to Social Security regulations. Lastly, Dr. [Prack's] opinions are inconsistent with the medical record as a whole. The medical record indicates that the claimant's weakness in his left side inhibits his mobility, yet his other impairments are well controlled with medication and treatment.

*Id.* at 15.

The ALJ is not bound by conclusory statements of a treating physician "particularly where they are unsupported by detailed objective criteria and documentation." *Buxton v. Halter,* 246 F.3d 762, 773 (6th Cir. 2001). According to Dr. Prack's medical records, Plaintiff's chief complaint throughout the first two years of Claimant's life were his sinus and ear problems. *Id.* at 365, 390, 394, 400, 404. Dr. Prack treated Claimant's asthma and recurrent bouts with infections and viruses and strongly encouraged smoking cessation in the home. *Id.* at 390.

-10-

Although Dr. Prack occasionally addressed Claimant's mild left hemiparesis, her comments typically reflected improvement in his condition. For instance, on January 11, 2008, Dr. Prack observes that Claimant is in physical therapy "and is moving both upper extremities much better." *Id.* at 365. On April 15, 2008, Dr. Prack indicates that Claimant is undergoing close observation by a pediatric neurologist for a misshapen skull, mild hydrocephalus, and left-sided weakness. *Id.* at 377. However, on September 9, 2008, Dr. Prack observes that Claimant's developmental delay "is showing considerable catch-up." *Id.* at 381. Dr. Prack writes, "He is suddenly making great strides. He has started to use a few words. He began walking last week. Mom denies any limping." *Id.* Dr. Prack's medical notes from January 7, 2009 indicate that Claimant "seems happy, developmentally advanced in Language," and "[s]eems to be growing well." *Id.* at 397.

Dr. Prack's medical notes do not support the conclusions reached in her Medical and Functional Equivalence Evaluation. As a matter of fact, the medical records as a whole do not support Dr. Prack's conclusions with respect to the degree of Claimant's limitations. Oddly, the medical records establish that Claimant is markedly limited in his ability to move and manipulate objects, the only domain in which Dr. Prack found less than marked limitations. Because the medical evidence directly contradicts Dr. Prack's conclusions, the ALJ did not err in discounting her opinion.

## VI. CONCLUSION

For the foregoing reasons, the Court AFFIRMS the ALJ's decision and DISMISSES Plaintiff's complaint in its entirety with prejudice.

IT IS SO ORDERED.

DATE: July 30, 2012                                  */s/George J. Limbert*
                                                    GEORGE J. LIMBERT
                                                    UNITED STATES MAGISTRATE JUDGE